Good afternoon, ladies. I'm Judge Dennis. I'll be, we'll be listening to you argue together with Judge Higgin, Englehart and Judge Higgs. This case is Christina Sansone versus Jazz Casino Company 2030640. Hear first from Ms. Vasquez. Yes, Tom. Good afternoon, Your Honor. May I proceed? Yes. May it please the court. My name is Jessica Vasquez and I represent the appellant Christina Sansone. Today Ms. Sansone appeals a district court's granting of the defendant's motion for summary judgment and final dismissal of all claims. Genuine issues of material fact exist and each and every claim asserted by Ms. Sansone. With respect to the Title VII claims, this case focuses on the hostile work environment action. Of the five elements in the hostile work environment action, three are not contested by Harris Casino. Two are Harris does not contest that Christina Sansone is a member of protected class and that she was a victim of uninvited sexual harassment and that the harassment was based on sex. They do contest whether the harassment affected her working conditions, terms or privilege of employment and whether they knew or should have known of the harassment and failed to take prompt remedial action. Sufficient record evidence exists to prove that the harassment affected her working conditions both subjectively and objectively. Ms. Sansone's own employee statement where she states on December 22nd 2017 that she was flagged by surveillance because she made a mistake on a game while she was being harassed by a customer and that's in the record on page 30. That piece of evidence alone shows it affected her working conditions at a minimum subjectively. Guiding versus best Chevrolet is instructive to determine whether conduct is objectively offensive. The totality of the circumstances should be considered including the frequency of the conduct, the severity, whether it was physically threatening or humiliating or merely an offensive utterance, whether it interferes with the employee's work performance. What we know is that it did affect her ability to play the game. The harassment was frequent. It was 24 encounters over twice a week for a span of three months. The customer made comments about Christina Sansone's breasts. The customer made sexual gestures to Christina Sansone. The customer made comments about her lips and her hair. The customer made comments about how he wanted to sleep with her and how sexy she was. It happened at work at her dealer table in front of other customers and under Harrah's surveillance. Other factors we asked this court to consider is that Christina Sansone was trained to go through three levels of management first and to not feel security directed. She was required to greet and interact with all customers. As a dealer, Christina Sansone was trained to remember our focus, protect our seven-star and diamond players, meaning she had to protect them from negative experiences. That's in the record at 563, arguably including the rejection of her own customer because diamond players were more valuable to the casino. That's in the record at 560. Christina Sansone could not leave her table. She had to face the front, protecting the bankroll at all times, so she was physically limited. Considering the totality of these circumstances, the incidents were more than just rude comments. These are sexual solicitations and humiliating, similar to conduct in the case of Donaldson. The most analogous cases are Donaldson v. CDB and Farapella Crosby v. Horizon because they both involved sexually suggestive comments and no physical touching over a period of months. One case was five months. Another case, it was twice a week over three months. Both cases looked at the totality of the circumstances. These cases support a finding that 24 instances within three months, considering the totality of the circumstances, gives rise to hostile work environment claim. Sufficient record evidence exists as to the fifth element of the hostile work environment claim. Plaintiffs can prove a climate-basic case that heroes knew or should have known about the harassment and failed to take prompt remedial action. There's record evidence that Sansone reported it to her floor supervisors and that security was not calling. Not just one floor supervisor, four supervisors. They told her to just ignore it. It was part of the job. Department procedures require a three-step process when there's an issue at the table. The dealer calls the floor, the floor calls the shift, then the shift can call security. All before anything is done to protect the dealer. Ms. Sansone was trained to follow up her chain of command and that is what she did. Harris argues that these four individuals were merely coworkers, but there's no record evidence to support that argument. With respect to the remedial action, prior to December 22nd, 2017, the floor simply told her to ignore it and it was part of the job. On December 22nd, there was an error in her game flagged by surveillance. So Stuart Conway came down to speak with her and she was told, she told him that the error was caused by a customer who was harassing her. He told her to submit an employee statement, but Stuart Conway did not read her statement. The assistant shift manager, Carrie Sharn, did not read her statement or surveillance or even review surveillance. Even though a basic description of the customer was available to Harris. They allowed, and we concede, they allowed Ms. Sansone to go home early, but that did not remediate the harassment. It simply delayed it. On December 25th, the customer comes in yet again. Ms. Sansone is so upset and scared, she requests that the floor supervisor, Marlene Castillo, tap her out of the game. That's in the record at 248. Stuart Conway is called, but all he does is okay Ms. Sansone's leave that day. He does not recall calling surveillance. Surveillance was able to catch the error in the game, but did not preserve the identity of the customer. Sending her home, again, was not a remedy to the harassment. It simply delayed it until she came back to work. These are the factual issues with regard to the remedial action and whether it was prompt or reasonable. Harris attempts to rely on the fair defense and they must prove both elements. They must prove that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior. However, Harris policies are contradictory. They have a paper policy regarding anti-discrimination and that employees could go to levels before security is called and they're trained to go to immediate floor supervisors for any complaints. Incidentally, Mark Hughes, the director of the table games department, has never read the policy regarding removing individuals who cause hostile work environment. Carrie Shine, the shift supervisor who ultimately terminated Sansone and did not review the policy. At the very least, they should have gathered information about the person's height, weight, description, preserved the surveillance, and notified security to protect the dealer. Harris has a sophisticated surveillance system where they watch everything that happens, except strangely they didn't preserve the video of the customer on those occasions or audio. They didn't have audio in the specific area that Christina Sansone was dealing in, existed in other places in the casino. Panhandlers are easily identified and evicted, but a harassing customer that came in at a minimum of 24 times over three months somehow could not be identified. They were not proactive, nor did they exercise reasonable care because their policies to protect the customers, not the dealers. With respect to the second fair element, whether the plaintiff employee reasonably failed to take advantage of any preventative or corrective opportunity, Sansone took advantage of preventive opportunities and reported that as she was trained to do, she reported to her floor supervisors, all four of them. Then she wrote an employee statement and ultimately she was fired on December 31st. Turning now to the retaliation claim, of the three elements necessary, one is disputed. Whether there is a causal connection between the adverse employment action and the protected activity. The firing was done just a few days after the second report incident in December 25th. She was fired on December 31st. Carrie Shine received a statement regarding harassment and yet still signed the termination letter. Carrie Shine was a material witness in another adverse hospital work environment case during the same timeframe Sansone was fired. Close timing between the protected activity and termination may provide causal connection under Swanson versus General Administration. However, plaintiff has closed timing in addition to other evidence that casts doubt on the credence of that decision. The burden then shifts to Harris to provide a legitimate non-retaliatory reason for termination. The termination letter provides several grounds. It states that she used the customer entrance instead of the employee entrance, but the termination for using the customer entrance, it was the only handicapped access entrance and she was granted an accommodation as a result of her disability to use that entrance. They terminated her because she was late for work, but the termination for being late for work is not legitimate as prior tardies and absences were excused by Mark Hughes as a result of her accommodation. The last reason it states is that Christina falsified information to reflect she was on time. Two days after the last incident of harassment, she forgets to clock in. Five days later, they ask her what time she started and ended her shift. She states, I worked 11 to 7 that day. I honestly think I walked in a minute before. Not sure though, but no later than 11, I believe. She clearly stated she was not sure. That cannot be a misrepresentation if she is unsure of the time. Falsification is intentional and an expression of doubt is not intent. Christina Swanson wrote down eight hours is when she worked and Harris has not alleged that she did not work eight hours, nor did they pull the complete video of her working that day to see what time she left. In the only reasoning given by the district court, the district court made a credibility call which was inappropriate for purposes of a summary judgment. The statement should have been interpreted in favor of the claimant to cast doubt on what time she actually came in that day. None of the reasons were legitimate on their face and in fact are contextual. Harris cannot rely on the previous firings for misrepresentation because they don't always fire for misrepresentation. On page 365 of the record, at least one incident occurred where falsification resulted in a documented coaching six months earlier before the termination. In the record at page 359 and 367, it shows two employees would have received additional pay, but there are no allegations here that Ms. Swanson somehow stole those hours and wanted extra pay. The only representation she made is that she worked eight hours and no one has contested that. These are the inconsistencies which are grounds for proving pretext under EEOC versus Stephen Allen. The fact that she was approved for accommodations regarding customer entrances and tardies and then later fire board is an inconsistency and for all these reasons, a primary case of retaliation exists and the reverse. With respect to the ADA claim, of the three elements in a discrimination claim, only one is challenged, whether she was terminated for her disability. Harris contends the termination was her misrepresentation, but the termination letter stands in stark contrast to that statement. The termination letter states she used the customer entrance instead of the employee entrance when going on duty. Policy violation was cited and it was stated that those violations were the under Pinkerton versus U.S. Department of Education. Sansone need only prove her disability was a motivating factor of her termination, not the only one. They knew she had a disability, accommodated her disability, and then used that as the basis for one grounds of her termination, which is a prime and basic case of ADA discrimination. Genuine issues of material fact exist in each and every one of the claims asserted by Ms. Sansone. After the briefing of these cases were submitted, a case, a decision by the name of Watkins versus Trigger was decided on May 7th, 2021, before Judge Jarlin, Steward, and Judge Oldham, which touches on the pretext evidence. Should this court request, we can provide additional briefing pursuant to Federal Appellate Rules 28F. That was a recent decision that came out last month that dealt with and with that, I appreciate your time, Your Honors. Thank you, Ms. Groth. Ms. Williams. Yes, Your Honors. May I proceed? Good. You may proceed. Thank you. May it please the court, again, my name is Jennifer Williams and I represent the appellee and the defendant below, Jazz Casino Company, DBA Harris Casino. I'd like to address each of the claims for which the district court granted summary judgment and for which Ms. Vasquez used the majority or the bulk of her time. The claim that I would like to address first is the retaliatory termination claim. Ms. Vasquez made much of the reasons for Ms. Sansone's termination in her principal argument. I would invite the actual termination paperwork, which can be found in the record at page 347, and the termination paperwork states in very clear detail the reasons for which Ms. Sansone was fired. She was let go because on 12-24-2017, she responded to a payroll audit email, the email for which can be found on page 348 of the record, that she reported to work at her scheduled time of 11 a.m. She then stated, which can be found on page 350 of the record, in a second table games sign-in time sheet that she worked eight hours that day. After retrieving surveillance footage, Ms. Sansone did not enter the property through the employee entrance. Instead, she walked directly to pit 11 and tapped on her game at 11-12 a.m. Christina was late for work and falsified information to reflect that she was on time. Was she provided notice to use the other entrance given her condition? Was there some type of written notice that she was given that she did not have to use the employee's entrance exclusively? Absolutely, Your Honor, and we don't contest that, and nothing about the termination paperwork says that she was let go for using a customer entrance. That is an incorrect reading in our position by Ms. Vasquez, and it is an incorrect reading by the panel if the panel reads it that way. The way it is written is that she specifically says she did not pass a time clock because she would make no sense, as Ms. Sansone herself testified, that she was allowed to use the customer entrance for several weeks. I believe it was a period of 12 weeks, and for this particular time for her to be let go for using that entrance for which the casino already let her use. Is it fair to state that Harris, as I understand what you're saying, is she was terminated because she was late for work by some 10 minutes? She was terminated, Your Honor, because she lied twice about being late for work. If she had been late for work and said, hey, I'm sorry, I was late for work, I had to use the customer entrance, as you know, or I didn't realize I was late for work, then she might not have been let go. But we're certain she was let go, as Carrie Shine, her supervisor and the person who recommended termination testified, for misrepresenting being late to work on two separate occasions. And I think it's important to mention, Your Honor, along that, the inheritor information that is in the record, and that inheritor information can be found at pages 359 through 370. Two other individuals said exactly what you just said. I was, I forgot to clock in. I was late to work and forgot to clock in. Okay, well, those two individuals were similarly let go. Lakeisha Norman was let go, and Brittany Gayton was let go for the same reason that Ms. Santone was let go, just for saying they forgot to clock in. Not for not clocking in, then responding to a payroll audit with incorrect information, then signing her own signature and her initials to a table games audit that also misrepresented how often or the time period that she got to work and whether or not she got to work late. So, 100%, Your Honor, to address that issue, Ms. Santone was let go for the misrepresentations of how many hours she worked that day, not for being late, not for using a customer entrance, and not for any type of accommodation. So that, unless Your Honors have more questions about the retaliation claim, I will move on to the ADA disability discrimination claim. Okay, so with regard to Ms. Santone's disability discrimination claim, you know, I think it's important that we remember here the accommodation that she requested and was given was to, as Your Honor so rightfully put, use this customer entrance. She was not, she was not granted an accommodation for anything else. She was not granted an accommodation to be late for work. She was not granted an accommodation to misrepresent the number of hours she worked or to misrepresent what time she came to work. In fact, she did not mention anything about not knowing that she was late for work or that the reason she was late for work had anything to do with any condition for which she was seeking accommodation. In Ms. Santone's deposition, she says, I questioned her, did you tell Ms. Shine that you didn't know you were late or give her a reason why you were late or why the hours weren't correct? No, I didn't. And so, with regard to the ADA claim, she simply cannot prove that she was let go, but that she would not have been let go rather, but for the disability. And I think it's important because they are sort of related to address the pretext claim as to both the retaliatory termination and the ADA discrimination. Now, Ms. Vasquez indicated in her argument and is upon which Ms. Santone engaged, which is to say on December 22nd, 2017, she made a written statement of a customer acting inappropriately and making inappropriate comments to her and her termination some nine days later. There is no question that nine days is close in time. But what we do know is that this court in Strong v. University Health System said, we affirmatively reject the notion that temporal proximity standing alone can be sufficient proof of but-for causation. Such a rule would unnecessarily tie the hands of the employers. So, for that reason, the temporal proximity that Ms. Vasquez has put forth is not enough to show pretext. And for the second reason, that taking all of what Ms. Vasquez says is true as to the mistake, because there was a lot made in Ms. Vasquez's argument about she didn't misrepresent, Harris was mistaken, Harris is reading her email incorrectly. Harris may be completely mistaken and wrong about the fact that Ms. Santone was 10 minutes late or 12 minutes late or no minutes late. But the fact that they were wrong does not indicate that the real reason in terms of her reason was disability discrimination. Even if the reason was false, she has not and cannot show any evidence in the record that the reasons given were both false and a pretext for discrimination or retaliation. And I would invite the court again to look at the extensive comparator evidence contained in the record on pages 359 to 370 for similar individuals who were let go for getting the clock into work or disputing the time on the time clock. Like Ms. Santone, those folks were let go as well. And finally, moving to the hostile work environment claim. Harris position is that there is no genuine issue of material fact as to either the fourth or fifth elements of Ms. Santone's hostile work environment claim. With regard to the fourth element, you heard Ms. Vasquez talk a little bit about whether or not the comments at issue were sufficiently severe or pervasive. Now, we know that this court has issued several summary judgment, affirmed summary judgment in several cases, Mendoza v. Bell Helicopter, Stewart v. Mississippi Transportation Commission, Morris v. Baton Rouge City Constable's Office, that relate to more egregious conduct than that which is at issue in this case, than the customer comments that were at issue in this case. Judge Guidry, having reviewed the record, found that there was no merit to Ms. Santone's hostile work environment claim and found that there was no genuine issue of material fact as to that claim. I will tell you that instructive to this piece of the equation is this court's decision in Peterson v. Linear Controls. And what Peterson says is, Peterson did not allege sufficiently severe or pervasive conduct. He worked for linear controls for six years, but his allegations regarding harsher job assignments concern only one 10-day period. More is required to show pervasive harassment. And that was an affirmance by this court of a summary judgment in favor of the employer. Likewise, Ms. Santone testified she worked three separate time periods for Harrah's, the most recent of which was 13 years, November 2004 to December 2017. And so even taking the 24 incidents that Ms. Santone contends occurred, that Ms. Vasquez has argued occurred, that is 24 instances of verbal conduct in 4,745 days of and it is worth repeating again that the comments in question were neither physical, physically humiliating, or of a nature that reaches the level of severity or pervasiveness that this court has said on numerous occasions is required to establish a prima facie case of harassment. Also, did you all have oral argument on this before the district judge? We did not, Your Honor. Okay. Moving on then to the fifth element of Ms. Santone's prima facie case, which is to say, did, should Harrah's known or have reasonably known about the harassment and failed to take prompt remedial action? And certainly, as you heard Ms. Vasquez say, the Farragher line of there are, frankly, fewer decisions upon which we can look that involve either a coworker or a customer, third party, as we have in this case. But the thought process and the substance behind the fifth element of Ms. Santone's prima facie case dovetails nicely with the cases that discuss and are decided upon Farragher, which is essentially, did we know and did we take quick enough action? And I will submit to you that we did take quick enough action because it was recorded in writing by Ms. Santone on December 22nd, 2017. She was removed from the table. She was offered time off. She took time off on December 23rd. On December 24th is when Ms. Santone misrepresents the time that she arrives to work and the number of hours she that day. On December 25th, she has a second verbal encounter with the customer. She is removed from the table and has no further conduct with him or contact, rather, with him after that. What I would invite the court to look at, because Ms. Vasquez has made mentioned several times in her argument about the fact that Harris seeks to protect the customers. Harris seeks to provide good customer service to the detriment of its employees. And I invite the court to look at the record, page 563, which is the actual testimony of the supervisor who let Ms. Santone go. Question by Ms. Vasquez. Would it be fair to say that you wanted to protect them from negative experiences while they are having fun in the casino? Ms. Shine says, yeah, that's our goal, customer service. Ms. Vasquez then says, and if someone, if one of these diamond or seven star players does something wrong to the dealer, even though they are this, you know, person that brings a lot of weight to the casino, what does the dealer need to do in that instance? What is their obligation? Ms. Shine says, report it to the supervisor. The supervisor should call the manager and we kick them out. Ms. Vasquez says, even if they're a seven star or diamond player, Ms. Shine says, oh yeah, if they cross the line and they go after any employee, whether it's a dealer, a supervisor, a cocktail server, I'm not concerned what status you are. Now there are things that I do afterwards, but I would kick out later, for example. And so finally, with regard to the policies that Ms. Santone contends that she availed herself of, the fair treatment policy that Harris has in place does provide for multiple avenues of reporting. Ms. Santone knew the policy. She knew how to report things. And in fact, she did report things. If you look at the witness statement that Ms. Santone herself authored on December 22nd of 2017, she indicates, I reported this conduct to Stewart Conway. I asked to go speak to Stewart's supervisor, Kevin. Stewart said, no, I don't want you to go speak to Kevin. We'll even, for purposes of this argument, that's in fact what Mr. Conway said. Take a look at Ms. Santone's statement. She says, I went to Kevin's office anyway. I went to Kevin's office and I spoke to him about the situation. That conversation results in the continued remedial action that Harris took after Ms. Santone reported this customer in writing. I would direct the court to both the cases in Harville versus Westford Communications and May versus FedEx Freight. Both of those cases are an affirmance of summary judgment on the fifth element of a hostile work environment claim, where the plaintiff says, and this relates to the time period during which Ms. Vasquez and Ms. Santone contend that they in both Harville and May, where the employer's policy, as Harris policy does, allows for the multiple avenues of reporting. Summary judgment was affirmed in both cases where the plaintiff failed to go beyond the first level supervisor until later, similar to what Ms. Santone did. And then once the plaintiff in those two cases went beyond the first level supervisor to the second level supervisor, the harassment was remediated as it was in this case. On both instances that were reported to a second level supervisor in December of 2017, Ms. Santone was removed from the table. She was sent home early. She did not work the next day after December 22nd. She did not come into contact with this customer after she went home early on December 25th, and she was subsequently let go as the record shows on December 31st for misrepresenting her time. And if the court has any questions, I'll be happy to answer them in my remaining one minute and 40 seconds. Otherwise, I believe I'm done. Thank you, Ms. Williams. Thank you. Ms. Vasquez, you have five minutes on rebuttal. Thank you, Your Honor. The cases pointed to by Jerez are nowhere near the comments, and I'm speaking to the severe and pervasive argument under the harassment, sexual harassment, work environment claim. Stewart, Morris, and Peterson are very far away from the situation in this case. Both in Morris and Peterson, they're talking about complaints of heavier workloads. And in Stewart, the comments were things like, you need to be sweet to me, and that he loved her. It was not what happened in this case. In this case, as we stated before, there were sexual gestures and overtly sexual language being used. We believe we can meet the threshold if not severe, but definitely pervasive. And as the court has noted in the jurisprudence that we've provided, comments over time build up, and you cannot view one incident in isolation. You must take the totality of the circumstances. With regards to the retaliation claims, in the termination letter, which is in the record on 32, I also invite the court to read it because it states that the policy violated the grounds for termination itself is policy 32. And policy 32 is all employees must use the employee entrance. If it was just because she was late, then why did you put it down as a policy violation? They cannot now manufacture non-discriminatory reason or else that gives doubt to the credence of the termination in the first place. And again, there's another case that was decided that uses that language, but EEOC versus Ethan Allen is to that point. And the point is if they go now to correct their grounds for termination and say, no, it's because she lied, even though what we have in writing says something else, that is enough to allow the court to see that there are inconsistencies. And if there is an inconsistency that goes to now the weight of the evidence, which belongs to the jury and not to the judge making the decision. And the other issue that I wanted to bring up is what they are silent about is what happened before December 22nd. At what point is it the victim's burden now? How many times does she have to report it to a floor supervisor? And at what point does that burden increase her that she has to go to now the second chain of command? There is testimony by Ms. Sansone in the record where she states she's trained by departmental standards. So this generalized policy that exists in paper is not what they're telling their dealers. And she testifies in her deposition, which is cited in our brief, that she was trained for departmental standards. If there's an issue at the table, you follow your chain of command. You can't call security. You can't move out of your space. You have to be tapped out by another dealer. You have to face your bankroll. There's lots of regulations that deal with what a dealer can do at a table. So this generalized blanket policy of yes, you can go to HR stands in contrast to what they're actually telling their employees to do. So at what point, if the response from Harris is not silent because floor supervisors are telling her, just ignore him. Just ignore him. It's part of the job. Just ignore them. That is not an appropriate remedial action. And neither is sending her home for one day or even two. It's just not. Remedial action is stopping the harassment, telling the security that this customer is a problem, maybe having some type of conversation with the customer. But at no time did Harris do that. All they did is they think that the appropriate remedial action is to get rid of the complaining victim, not to do anything to the person that's harassing them. That's the problem. That is a problem. And that is for the jury to decide. The last point that I wanted to bring up was the allegation that she is lying. When she put down eight hours, they have no proof. They've provided no legitimate basis for firing her. And although the case law is clear, if it's a business decision, it's a business decision. But if it's not a true business decision and there are aspects of it that can be challenged, at what point is a misrepresentation pretextual? And that's where we're at right now. What our allegations are is that the misrepresentations were used in the effort of furthering their pretext. And their pretext is let's get rid of the victim. Yes, maybe other people were terminated for them, but that's not the only action they could have taken. There's at least one piece of evidence in the record that I cited to earlier that indicates someone got a documented coaching rather than being terminated for being 10 minutes late. So let me just double check. And on that, that is the remainder of my point that I wanted to cover. Thank you for your attention. Thank you. This case will be submitted and this panel will adjourn until further notice. Signing out.